# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CAROLYN DAVIS-CROWDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 05 C 7119** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. Plaintiff, Carolyn E. Davis-Crowder ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner" or "Defendant"), claiming that her denial of Claimant's request for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") should be reversed or remanded because the Administrative Law Judge: (1) made improper credibility findings; (2) improperly characterized Claimant's asthma; (3) failed to recontact Claimant's doctors; (4) failed to give Claimant an opportunity to discuss her non-compliance with medication; (5) failed to incorporate all of Claimant's limitations into her residual functional capacity ("RFC"); and (6) wrongly found Claimant able to work. For the reasons stated below, this Court grants Claimant's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment.

# I. BACKGROUND FACTS

## A.	PROCEDURAL HISTORY

Claimant applied for DIB and SSI on October 9, 2002, claiming she was disabled as of March 21, 2001, due to symptoms stemming from thyroid cancer and related treatment. R. 88-90, 94.  The Social Security Administration denied Claimant's applications initially on December 23, 2002, R. 27-31, and again upon reconsideration.  R. 33-36.  On April 22, 2003, Claimant filed a request for a hearing before an administrative law judge.  R. 37-41. Administrative Law Judge William Wilkin ("ALJ") conducted a hearing on September 29, 2003, in Gary, Indiana, at which James Miller, a non-attorney representative, represented Claimant.  R. 57-60, 577-622.  At that hearing, Claimant testified, as did her uncle, Joshua Tabor, and Vocational Expert ("VE") Michelle Peters.

On October 8, 2003, the ALJ requested Claimant receive a consultative examination. R. 63.  A second hearing took place on March 12, 2004, at which Claimant and VE Leonard Fisher testified.  R. 623-54.  The ALJ issued a decision on March 19, 2004, found Claimant not disabled, and denied Claimant's application for DIB and SSI.  R. 12-23.  On April 2, 2004, Claimant filed a request for review of the ALJ's decision.  R. 10.  The Appeals Council denied Claimant's request for review on May 7, 2004.  R. 7-8.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1).  This Court conducted an oral argument on July 12, 2006.

**B.     HEARING TESTIMONY- SEPTEMBER 29, 2003**

**1.     Claimant's Testimony**

Claimant was 39 years old at the date of the hearing.  R. 584.  Claimant completed high school and earned a Certified Nursing Assistant ("CNA") degree in 1982.  R. 585. Since that time, Claimant worked directly with patients as a CNA in hospitals, nursing homes, and private homes under the auspices of a registered nurse.  R. 586-87.

Claimant stopped working on March 21, 2001 because her asthma was bothering her and she developed a constant sore throat.  R. 588.  At that time doctors discovered a goiter in her thyroid that partially blocked her airways.  R. 589.  Claimant's symptoms continued, and in September 2002, she had surgery.  R. 589.

After the surgery, she started having seizures in January, 2003.  R. 590.  She began taking Dilantin for the seizures, but still had seizures on February 14, 2003 and March 31, 2003.  R. 591-92.  According to her doctor the seizures were caused by a low level of calcium.  R. 593.  Her next seizure was in July 2003, followed by one on August 23, 2003. R. 593.

At the time of the hearing, Claimant was taking several medications: Dilantin, Synthroid, Caltron, calcium, an inhaler, and Clarinex (for allergies). R. 596.  The side effects caused her to feel very tired.  R. 596.  Claimant's asthma caused heavy breathing because the airway was constricted.  R. 595.  Claimant's doctor considered surgery to open her airway. R. 595.

Claimant also complained of spasms in her throat, hands, and legs.  R. 606.   When

the throat spasms occurred, Claimant had to stop what she was doing, lie or sit down, and massage her throat until the pain went away.  R. 606.  The spasms occurred once or twice a week, lasted about fifteen to twenty minutes, and were related to a low level of calcium.  R. 606-07.  She also claimed the low level of calcium caused her hands to cramp up, and her hands and legs to spasm.  R. 606.

Claimant's daily routine typically involved waking up around 7:30 a.m., sending her son to school, taking medication, and eating breakfast.  R. 597.  She spent most of her day laying down or napping, and going to doctor appointments.  R. 597-98.  She did not sleep through the night, but she slept about six hours total at night.  R. 596.  Claimant stopped driving after her seizure on March 31, 2003.  R. 598.  She could walk at most a block at a time and would experience shortness of breath before walking the whole block.  R. 599, 602-03.  Claimant did "a little light work" around the house, watched television, and did not have any hobbies.  R. 599-600.

She was able to stand for about 30 to 40 minutes before she needed to sit down and could sit for about two hours.  R. 602.  She could bend and stoop fine and could lift a gallon jug of milk, estimated to be 8.75 pounds, and perhaps she could lift about ten pounds.  R. 603.

### 2.    Joshua Tabor - Claimant's Uncle

Joshua Tabor ("Tabor"), Claimant's uncle, lives near her.  R. 608.  Tabor saw Claimant two to three times a week and took her to every doctor appointment after her surgery.  R. 608.  Tabor did not witness any of Claimant's seizures, but he was on the phone

with her when one of the seizures occurred.  R. 608-09, 610.  Tabor testified that Claimant had good and bad days, had shortness of breath at times, and went through coughing spells. R. 609.  He testified that Claimant frequently needed to take naps.  R. 609.

### 3.    Michelle Peters - (VE)

Michelle Peters, a certified rehabilitation consultant, testified as a VE regarding Claimant's past relevant work and suitable existing jobs for Claimant.  R. 610-19.  Claimant previously worked as a certified nursing assistant, which  the DOT considered to be a low-end, semiskilled job, and medium in physical demand, but Claimant performed heavy duties. R. 611-12.  The ALJ does not rely on this VE's testimony and neither party refers to her testimony in their arguments.

## C.    HEARING TESTIMONY - MARCH 12, 2004

### 1.    Claimant's Testimony

At the second hearing, Claimant testified that she continued to have seizures and her doctor started her on another medication, Calvitrol, in addition to her Dilantin and increased her calcium due to the spasms.  R. 628.  She did not go to the doctor every time she had a seizure.  R. 628.  Since the first hearing, Claimant recalled having three more seizures on October 4, 2003, January 1, 2004, and February 1, 2004.  R. 629.

Claimant still had problems with her calcium, thyroid, and asthma.  R. 630.  She used a bronco-dilator everyday and used a nebulizer machine once or twice a week.  R. 630-31. Claimant still took medication for the thyroid and her doctor said the medication was "doing a pretty good job."  R. 631-32.

Since Claimant began taking Clavitrol on January 22, 2004, she felt that it made her "spacey." R. 633-34. Claimant continued to have cramps and spasms in her fingers, toes, and neck that lasted about five minutes, but on some days they came and went throughout the day. R. 635-36. The spasms occurred between one to three times a day. R. 637.

The Dilantin caused Claimant to be tired all the time and gave her headaches and occasionally blurred vision. R. 637-38. Claimant sometimes woke up stiff in the morning because of nocturnal seizures. R. 638. She could not say if she told the ALJ about all of the night seizures because she did not always remember them. R. 639.

Claimant's duties during home visitations consisted of cooking, cleaning, bathing, and helping patients in and out of bed. R. 641. She did not feel comfortable working as a CNA again because she worried that she would hurt herself or her patients. R. 653.

## 2. Leonard Marion Fisher - (VE)

Leonard Fisher, a VE, testified regarding Claimant's past relevant work and her current ability to find work. R. 643-52. Claimant worked as a CNA, which is medium and semiskilled and requires technical knowledge and direct patient care. The VE stated that institutions and nursing homes have a higher exertional level than home care. R. 644.

The ALJ's first hypothetical asked the VE to consider a person who was about forty years old, has a twelve-year education, and worked as a CNA, but had limitations requiring light work function, a clean atmosphere, no heights or moving machinery, and a low-stress job. R. 646. The VE stated that such a person could not perform past work, but had transferable skills to a home companion (2,000 jobs in Cook and Lake County). R. 646. If

there were no transferable skills, then the person could find unskilled light work. R. 646-47.

The ALJ's second hypothetical assumed the same limitation as the first hypothetical, but required the person be absent for at least one day per month. R. 647. The VE testified such a person could still sustain competitive employment, but if the person had to be absent more than one day a month, the person could not sustain employment without accommodation. R. 647. The ALJ's third hypothetical asked whether a person who had an RFC for sedentary work and the same limitations as in hypothetical one could perform any past work. R. 647. The VE testified the person could not perform past work and did not have transferable skills, but could work at unskilled sedentary jobs. R. 647-48.

The fourth hypothetical asked the VE to consider whether a person with an RFC for either medium, light, or sedentary work who could not perform employment for eight hours a day or a forty-hour work week could still find full-time work. R. 648. The VE stated this would preclude full-time work. R. 648. The VE understood the limitation of a "clean atmosphere" to mean an atmosphere "free of pollutants, fumes and dust in any significant quantity." R. 648. He considered a "low stress" job to be a job where one was not under pressure or did not work on a piecework basis. R. 649.

## C.     MEDICAL EVIDENCE - PHYSICAL HEALTH

### 1.     Ingalls Memorial Hospital - July 2002

On July 2, 2002, Claimant had an ultrasound of her thyroid at Ingalls Memorial Hospital. R. 210. She had complained of an enlargement of the neck and difficulty swallowing. R. 210. The ultrasound indicated a uniformly enlarged thyroid gland with

multiple small hypoechoic nodules distributed throughout it.  R. 210.

**2.     Mount Sinai Hospital - October 24, 2002 - November 8, 2002**

Claimant was admitted to Mount Sinai Hospital on October 24, 2002, for hyperthyroidism.  R. 212.  Dr. Hasmukh Patel ("Dr. Patel") reported that Claimant had experienced sore throat, and neck pain for the past three years, but that it had worsened with choking since July 2, 2002.  R. 213.  On October 25, 2002, Claimant underwent surgery for a thryroidectomy and she was discharged on November 2, 2002.  R. 218-80.

**3.     University of Chicago Hospital  - November 26, 2002**

The University of Chicago Center for Speech and Swallowing's Dr. Kerstin Stenson examined Claimant on November 11, 2002 and filed an Oropharyngeal Motility Study Report on November 26, 2002.  R. 196.  Claimant was diagnosed with (R) TVC paresis and (L) TVC paralysis and was on a soft diet at the time of exam.  R. 196.  The report indicated that Claimant's swallowing function was moderately impaired.  R. 196.

**4.     Dr. Patel - Medical Report**s

Dr. Patel completed a neoplasm report for the Bureau of Disability Determination Services after he re-examined Claimant on December 3, 2002.  R. 281.  The report declared that Claimant's diagnosis was hyperthyroidism and post-thyroidectomy with vocal cord paresis and hypo-parathyroidism.  R. 281.  There was no evidence of recurrence since the thyroid surgery.  R. 281.  Dr. Patel opined that Claimant had a hoarse voice, difficulty swallowing, and was unable to work.  R. 281.

Dr. Patel completed a respiratory report on February 6, 2003.  R. 292.  He examined

her on January 8, 2003 and diagnosed her with total thyroidectomy, hypocalcemia post thyroidectomy and vocal cord paresis. R. 292. He reported Claimant had wheezing breath sounds. R. 292. Claimant's therapy consisted of calcium therapy, asthma medication, and thyroid replacement. R. 293. He again opined that Claimant was unable to work. R. 293.

### 5. Dr. Boyd E. McCracken - RFC Assessment- December 12, 2002

Dr. Boyd E. McCracken ("Dr. McCracken"), a non-examining physician, completed a RFC assessment of Claimant's hypertyroidism and post total thyroidectomy condition on December 12, 2002. R. 283-90. Dr. McCracken reported Claimant could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight-hour workday, and push and pull  limited only to lifting and carrying restrictions. R. 284. Dr. McCracken noted the current therapy was controlling the growth and there were no other severe problems except some difficulty swallowing. R. 284. He further determined that Claimant had no postural, manipulative, visual or communicative limitations. R. 285-87. Claimant needed to avoid concentrated exposures to extreme cold or heat, wetness, humidity, noise, vibration, fumes, and hazards. R. 287. Dr. Charles Kenney ("Dr. Kenney") affirmed the RFC assessment on February 25, 2003. R. 283, 290.

### 6. Claimant's Seizures in 2003

On January 25, 2003, Claimant was admitted to Ingalls Memorial Hospital following a seizure. R. 445. She was discharged on January 29, 2003, with instructions to do activities as tolerated and to not drive a car. R. 205. Claimant was prescribed Dilanton, calcium, Synthyroid, and Claritin, and told to contact Dr. Nader Beshay ("Dr. Beshay") if she had any

problems.  R.  205.

Claimant had another seizure on February 14, 2003, and South Cook County paramedics came to her house.  R. 204.  Claimant went to the University of Chicago Hospital on February 25, 2003, and was diagnosed with hypocalcemia and advised to continue taking the calcium supplements.  R. 203.  On March 31, 2003, Claimant was treated at South Suburban Hospital for a seizure caused by hypocalcium and again told to increase her calcium.  R. 201-02.

The University of Chicago Hospitals treated Claimant in 2003 and issued a report in September 2003.  R. 502-03.  The hospital performed an MRI and electroencephalogram, which was abnormal for Claimant's awake, drowsy, and sleep states.  R. 311-12; 516.  Her seizures lasted one to two minutes and she would lose consciousness and bite her tongue. R. 502.  The report estimated that Claimant had one seizure every two months, and her last seizure was on August 9, 2003.  R. 502.  According to the report, "[Claimant's] seizures are relatively controlled with Dilantin, despite occasional non-compliance."  R. 503.

### 7.  Dr. James Tao - Seizures RFC Questionnaires

Dr. James Tao ("Dr. Tao"), one of Claimant's treating physicians for her seizures, completed a Seizure RFC Questionnaire on November 11, 2003.  R.  529-32.  He reported that Claimant had complex partial seizures lasting one to two minutes during which she would lose consciousness.  R. 529.  The frequency of the seizures were roughly one per month, and began without any warning.  R. 529.  Stress and sleep deprivation were precipitating factors. R. 530.  After the seizure, Claimant experienced confusion, exhaustion and irritability for one to two hours.  R. 530.  Dr. Tao stated that Claimant was compliant

with taking medication, but missed doses occasionally. R. 530. The medication caused Claimant to become lethargic and dizzy. R. 531. Claimant's seizures were likely to disrupt the work of co-workers and required Claimant to need more supervision at work than an unimpaired worker. R. 531. Claimant could not work at heights, work with power machines, or operate a motor vehicle. R. 531. Dr. Tao opined that Claimant only was capable of low stress jobs because stress provoked seizures. R. 532.

Dr. Tao completed a second Seizure RFC Questionnaire on March 11, 2004. R. 545-48. His second report was very similar to the first, except in the second he noted Claimant had "0.5 - 1 [seizures] per month." R. 545. The second report stated Claimant also experienced muscle strain after the seizures[1] and the residual effects would last one to two days. R. 546. The seizure moderately impaired Claimants daily activities. R. 546. In this second report, Dr. Tao found Claimant compliant with the medication regime and noted that the Dilantin additionally caused a lack of alertness. R. 546-47. Claimant possibly suffered from depression and had short attention span. R. 547. Dr. Tao imposed the same work related limitations that he stated in his first report, but opined that Claimant would miss about three days of work each month. R. 547-48.

**8.    Dr. Dinesh K. Jain - Consultative Examination - November 20, 2003**

Claimant saw Dr. Dinesh K. Jain ("Dr. Jain") for a consultative examination on November 20, 2003. R. 533. Dr. Jain stated that Claimant has a history of goiter that was surgically removed in 2002 and since the surgery she developed hypocalcemia, but she did

---

[1]This is in addition to the confusion, exhaustion, and irritability Dr. Tao noted in the first report. R. 530.

not have any symptoms of hypocalcemia because she was taking medication.  R. 534.  Dr. Jain diagnosed Claimant with an uncontrolled seizure disorder, moderate bronchial asthma, hypothyroidism, and hypocalcemia.  R. 535.

Dr. Jain completed a medical assessment of her ability to do work-related activities. R. 536-39.  Dr. Jain stated that Claimant's impairments did not affect her ability to lift, carry, or sit but they did impair her ability to stand and walk because the medication made her tired. R. 536-37.  Claimant could occasionally climb and could frequently balance, stoop, crouch, kneel, and crawl.  R. 537.  Furthermore, Dr. Jain found that Claimant's impairments did not affect her ability to reach, handle, feel, push/pull, see, hear, or speak.  R. 538.  Claimant should avoid heights, driving, and hazardous machinery due to her seizures, and avoid chemicals, dust, fumes, and humidity due to her bronchial asthma.  R. 538-39.

## D.   THE ALJ'S DECISION - MARCH 19, 2004

The ALJ found Claimant was not disabled within the meaning of the Social Security Act ("SSA").  R.  12- 23.  Although the ALJ found Claimant to have the "severe" impairments of status post thyroidectomy with residual hypocalcemia, a seizure disorder, and asthma, he determined she could perform a wide range of light work.  R.  22-23.

The ALJ assessed Claimant's applications for DIB and SSI under the five-step sequential analysis.  *See infra*, Part II B (describing the disability standard of review).  Under step one, the ALJ deferred a finding of substantial gainful activity since the alleged onset date because Claimant's work reports were conflicting and he found the medical evidence was sufficient to support his decision.  R. 17.

Under the second step, the ALJ found Claimant has status post thyroidectomy with

12

residual hypocalcemia, a seizure disorder, and asthma, all of which are "severe" under the SSA. R. 18. At step three, however, the ALJ determined these impairments did not meet or equal any impairment listed under the Social Security Regulations ("SSR"). R. 19.

Under step four, the ALJ determined Claimant's RFC. Although he believed Claimant "was a reasonably credible witness, and seemed honest in trying to describe her capabilities and limitations," the ALJ did not find any corroboration in the written record for the reports of hand and toe spasms and he did not believe that Claimant's seizures occurred as frequently as her counsel claimed. R. 20. Furthermore, the ALJ concluded that some of Claimant's seizures were attributable to Claimant's "less-than-rigorous compliance" with her Dilantin regimen. R. 20. Additionally, the ALJ concluded that while Claimant's asthma caused shortness of breath and wheezing, her asthma was fairly mild and stable on medication. R. 20.

The ALJ credited Dr. Jain's assessment to the extent the assessment stated that Claimant must avoid heights, machinery, and pulmonary irritants. R. 20. The ALJ rejected the assessment that Claimant has no lifting or carrying restrictions because he thought it was highly unlikely that a person with asthma and a seizure disorder could lift or carry at a heavy level. R. 20. The ALJ did not credit Dr. Jain's non-specific walking and standing restrictions because he considered them "too vague to be useful." R. 20.

The ALJ also considered Dr. Tao's two seizure questionnaires. The ALJ noted that these reports were entitled to some weight, but were based on the assumption that Claimant was fully compliant with her medication. R. 20. Since there is evidence that Claimant was not fully compliant, the ALJ decided that "her seizures would all but disappear with full

13

compliance[,]" and so he did not give full weight to Dr. Tao's reports.  R. 20.  In his first report, Dr. Tao stated the side effects of the seizure would last one to two hours, and the ALJ accepted this assessment instead of the second report, which stated the side effects would last one to two days.  R. 20.

Regarding two reports from Dr. Patel that stated that Claimant would be unable to work, the ALJ noted that Dr. Patel completed the reports shortly after Claimant's surgery and Claimant was still having considerable difficulty swallowing.  R. 20.  The ALJ determined that those problems had been nearly resolved, except for her occasional throat spasms, and so the opinions may no longer be relevant.  R. 20.

The ALJ concluded Claimant had the RFC to perform a wide range of light work activity.  R. 21.  Based on Dr. McCracken's RFC assessment, the ALJ found Claimant could lift and carry ten pounds frequently and twenty pounds occasionally, and could stand or walk about six hours total during an eight-hour day.  R. 21.  He further found her able to "sit and stand for prolonged periods, and can bend, stoop, handle and manipulate without difficulty."  R. 21.  The ALJ found Claimant had limitations that required her to avoid heights and moving machinery, and required her to work in a clean atmosphere.  R. 21.  She was also limited to "low stress work activity."  R. 21.

Under step four, the ALJ determined that based upon her RFC, Claimant could not perform any of her past relevant work.  R. 21.  Relying on the second VE's testimony, the ALJ concluded that Claimant had skills that directly transferred to work as a home companion.  R. 22.  Even if Claimant did not have transferrable skills, the ALJ found at step five that Claimant could perform light work and thus "[C]laimant is capable of making a

successful adjustment to work that exists in significant numbers in the national economy."

R. 22.  Therefore, the ALJ determined Claimant was not disabled within the meaning of the

SSA.  R. 22.

## II.  LEGAL STANDARDS

### A.    STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive."    42 U.S.C. § 405(g).    A decision by an

administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals

Council denies a request for review.  *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993)**.**

Under such circumstances, the decision reviewed by the district court is the decision of the

ALJ.  *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir.

1993).  Judicial review is limited to determining whether the ALJ applied the correct legal

standards in reaching his decision and whether there is substantial evidence in the record to

support the findings.  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  A mere scintilla of

evidence is not enough.  *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995).  Even when there

is adequate evidence in the record to support the decision, however, the findings will not be

upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge

between the evidence and the result."  *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).

If the Commissioner's decision lacks evidentiary support or adequate discussion of the

issues, it cannot stand.  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.** The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.    DISABILITY STANDARD

DIB are available to claimants who can establish "disability" under the terms of Title II of the SSA, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). SSI are available to "disabled indigent persons" under Title XVI of the SSA, ("Title XVI"). *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Titles II and XVI of the SSA employ the same definition of "disability." *Id.* That is, an individual is "disabled" if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A);

1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart,* 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

### III.  DISCUSSION

Claimant raises six issues for review: (1) whether the ALJ made improper credibility findings regarding the frequency of Claimant's seizures; (2) whether the ALJ improperly characterized Claimant's asthma as "mild"; (3) whether the ALJ failed to recontact doctors regarding Claimant's hand and toe spasms; (4) whether the ALJ failed to give Claimant an opportunity to discuss her non-compliance with medication; (5) whether the ALJ failed to incorporate all of Claimant's limitations into the RFC; and (6) whether the ALJ wrongly found Claimant to have transferable skills and whether his step five decision is erroneous. The Court will discuss each issue in turn.

### A.  THE ALJ'S CREDIBILITY DETERMINATION REGARDING THE FREQUENCY OF CLAIMANT'S SEIZURES IS NOT PATENTLY WRONG.

Claimant argues that the ALJ erroneously rejected her testimony about the frequency of her seizures when the ALJ decided that her seizures do not occur as often as Claimant's counsel reported in a letter to the ALJ prior to the second hearing. R. 20. The Commissioner asserts that the ALJ's credibility determination is entitled to deference because the determination is not patently wrong and is supported by the record.

The ALJ's credibility determination must stand unless the assessment is patently wrong in view of the record. *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986). Here, Claimant testified she had five seizures prior to the first hearing[2] and three additional seizures after that hearing.[3] It is unclear whether Claimant included her night seizures when she told the ALJ the dates she had seizures. R. 639. In a letter to the ALJ dated January 22, 2004, Claimant's representative states that she had eleven seizures[4], rather than the eight seizures to which Claimant testified. R. 540.

Reports from Claimant's treating doctors indicated that Claimant reported having a seizure on August 9, 2003, but there is no evidence of the other seizures mentioned in the representative's letter. R. 502, 529, 540. Dr. Tao indicated that Claimant has one or two seizures every two months, which is supported by a report from The University of Chicago Hospital that estimated Claimant had one seizure every two months. R. 573, 502. Given the

[2]Claimant testified she had seizures on: January 25, 2003; February 14, 2003; March 31, 2003; July 2, 2003; and August 23, 2003. R. 592-94

[3]Claimant testified she had seizures on: October 4, 2003; January 1, 2004; and February 1, 2004. R. 629.

[4]Claimant testified she had an additional seizure since the letter. R. 629.

evidence in the record, the ALJ's determination that Claimant had fewer seizures than the letter alleged is not patently wrong, and thus is entitled to deference. *Diaz*, 55 F.3d at 308.

**B.     THE ALJ'S CHARACTERIZATION OF CLAIMANT'S ASTHMA AS MILD IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

Claimant argues that the ALJ erred in concluding that her asthmatic condition was fairly mild and stable on medication. R. 20.

The ALJ's conclusion that Claimant's asthma is mild and stable with medication is not supported by the record. Dr. Jain, at the consultative examination, determined that Claimant had bronchial asthma that was moderate in intensity. R. 533. At the second hearing, Claimant reported that she used a bronco-dialator every day and a nebulizer once or twice a week. R. 630-31. Claimant experienced shortness of breath and wheezing and stated that asthma impaired her ability to walk, climb, and work in certain environments. R. 533- 539. There is no evidence in the record to contradict Dr. Jain's determination that Claimant had moderate, and not mild, asthma, and thus there is not substantial evidence to support the ALJ's conclusion.

**C.     THE ALJ ERRONEOUSLY FAILED TO RECONTACT CLAIMANT'S DOCTORS TO CLARIFY WHETHER CLAIMANT'S COMPLAINTS OF SPASMS WERE RELATED TO HYPOCALCEMIA.**

Claimant argues that her hand and toe spasms are related to her hypocalcemia and thus the ALJ erred in dismissing her complaints. The Commissioner argues that the Court should not engage in a *de novo* credibility analysis.

SSR 96-7p states that when a claimant makes statements about symptoms, the statements are not enough to establish the existence of a physical impairment. Instead the

ALJ should employ a two-step process in evaluating the credibility of the claimant's statements about her symptoms. SSR 96-7p. First, the ALJ needs to determine whether there is a medically determinable impairment that could reasonably be expected to cause the claimant's symptoms. *Id.* Next, the ALJ needs to evaluate the intensity, persistence, and limiting effects of the claimant's symptoms. *Id.* Because actual symptoms may differ somewhat from what the medical evidence shows, the ALJ must also consider seven factors relating to the claimant's statements, including daily activities, frequency and intensity of symptoms, and functional limitations. *Id.*

In this case, Claimant attributed her spasms in her hands and toes to calcium deficiency. R. 635. Medical records confirm Claimant's assertion that she suffered from hypocalcemia. R. 362. Hypocalcemia occurs when the body has an abnormally low level of calcium in the blood.[5] While mild hypocalcemia typically does not have symptoms, as hypocalcemia becomes more severe, symptoms such as muscle cramps, twitching, and seizures can occur.[6] Claimant's diagnosis of hypocalcemia indicated that she had a medically determinable impairment that could reasonably be expected to cause the spasms in her toes and hands.

After finding that Claimant's spasms may be related to her hypocalcemia, the ALJ must evaluate the intensity, persistence and limiting effects of Claimant's symptoms to determine the extent to which the spasms affect Claimant's work ability. SSR 96-7p.

_____

[5]*Stedman's Medical Dictionary* 834 (26th ed. 1995).

[6]http://www.webmd.com/hw/health_guide_atoz/tm7047.asp?navbar=hw3833 (last visited on July 3, 2006.)

Claimant testified the spasms occur one to three times a day and last about five minutes. R. 635-37. It is not clear from the record how the spasms affected Claimant's ability to work. R. 518. At the first hearing, Claimant testified that her hands performed fine except when she was having a seizure. R. 601. There is no subsequent evidence that Claimant had physical limitations due to her hand and toe spasms, and it is unclear what limitations hypocalcemia causes. Claimant therefore argues that the ALJ should have obtained a medical expert's opinion to clarify what hypocalcemia is and what limitations it causes.

The ALJ cannot "play doctor" and make his own independent medical findings, but instead must base his decision on medical evidence and testimony. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). If the medical evidence is insufficient to make a determination of disability, the ALJ has the duty to obtain additional information and clarify reported findings. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). Here, the ALJ did not "play doctor" because before he made his findings he referred Claimant for a consultative examination, after which Dr. Jain reported that Claimant did not have a history of any symptoms of hypocalcemia. R. 534. However, Claimant's complaints of leg and toe spasms are documented in her medical records. R. 358, 518. The ALJ did his duty to obtain additional information on Claimant's general condition, but he should have recontacted Claimant's doctors or contacted a medical expert to clarify whether Claimant's hand and toe spasms were related to Claimant's severe hypocalcemia before dismissing her testimony.

**D.    THE ALJ ERRED BY FAILING TO GIVE CLAIMANT AN OPPORTUNITY TO DISCUSS HER NON-COMPLIANCE WITH MEDICATION.**

Claimant argues that the ALJ's determination that Claimant was non-compliant with

her medication regime was incorrect because there was only one report that Claimant missed doses of medication. Moreover, Claimant argues that the ALJ never investigated whether this non-compliance affected the frequency of seizures.

Pursuant to SSR 82-59, a claimant that fails to follow a prescribed treatment cannot be considered disabled unless there was a justifiable cause for the failure. The ALJ needs to ensure, however, that the treatment would have restored the claimant's ability to work, and the ALJ must to allow the claimant an opportunity to explain why she did not follow the treatment. SSR 82-59.

In this case, the ALJ concluded that "since [C]laimant has relatively infrequent seizures despite marginal compliance, her seizures would all but disappear with full compliance." R. 20. The University of Chicago Hospital noted in one report that Claimant occasionally misses her doses of Dilantin, and Dr. Tao noted the same in his first report in November 2003. R. 502, 530. However, Dr. Tao's report in March, 2004, stated that Claimant was compliant in taking her medication. R. 546. Moreover, there is no evidence in the record concerning the effect of Claimant occasionally missing doses of medication. As stated above, the ALJ cannot play doctor and rely on his own conjecture about medical evidence to reach that determination. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). Therefore, since the ALJ did not inquire how missing an occasional dose of medication would affect Claimant's seizures and did not ask Claimant about the frequency of her non-compliance, the ALJ erred in concluding that Claimant's seizures would end if she was fully compliant with medication.

**E. THE ALJ FAILED TO CONSIDER ALL OF CLAIMANT'S LIMITATIONS IN HIS RFC ASSESSMENT.**

Claimant argues that the ALJ failed to consider her limitations due to asthma and hypocalcemia, the side effects of her medication, her ability to stand, walk, and sit, and the effects of her seizures. The ALJ determined Claimant had the RFC to do light work and she must avoid working around heights and moving machinery, she must work in a clean atmosphere, and perform only low stress work. R. 21.

In a RFC assessment, the ALJ must consider all functional limitations resulting from the claimant's medically determinable impairments, and he must determine the RFC only after he performs a function-by-function analysis. SSR 96-8p. The ALJ must consider physical abilities, mental abilities, and other abilities affected by impairments, as well as the total effect of all impairments. 20 C.F.R. § 404.1545. There are eight physical skills that the ALJ must consider in the function-by-function analysis: sitting, standing, walking, lifting, carrying, pushing, pulling, and postural/ manipulative abilities. *Id.*

**1. The ALJ should have recontacted Claimant's doctors to determine her limitations due to the thyroidectomy and hypocalcemia.**

Plaintiff was status post thyroidectomy and had residual hypocalcemia. R. 22. Claimant argues, however, that it is unclear whether these medical conditions factored into the ALJ's RFC finding. The Commissioner argues that Claimant does not have any other limitations as a result of these impairments.

In addition to including all of a claimant's limitations in the RFC, an ALJ must build a logical bridge linking the evidence to his conclusions in his decision. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Furthermore, an ALJ has a duty to recontact doctors to

clarify their medical opinions if necessary. *Barnett*, 381 F.3d at 669. In this case, the ALJ did not indicate that any limitations in her RFC were a result of hypocalcemia or status post thyroidectomy. R. 22. In February 2003, Dr. Patel noted that Claimant was unable to work due to her thyroid problems, but the ALJ stated that since Dr. Patel completed the report soon after the thyroidectomy, it did not reflect Claimant's current ability to work. R. 292-93, 20.

In determining her RFC the ALJ ignored Dr. Patel's reports and relied on the opinion of two non-examining physicians for the State Agency who concluded that Claimant's current therapy is controlling the thyroid problem and there are no other severe problems except some difficulty swallowing. R. 283-90. Since these physicians are "highly qualified physicians ... who are also experts in Social Secuirty disability evaluation," the ALJ was entitled to use their opinions as evidence in determining Claimant's RFC. 20 C.F.R § 404.1527(f)(2)(i). However, the State Agency report was completed at roughly the same time as Dr. Patel's reports, so it is unclear why the ALJ accepted their report but rejected Dr. Patel's report as being too soon after the surgery to be useful. R. 281, 283-90, 292-93, 20. The ALJ should have recontacted Dr. Patel to determine the current condition of Claimant's thyroidectomy, or articulated a reason for determining that the State Agency RFC assessment was more credible than Dr. Patel's report.

## 2.     The ALJ's RFC assessment did not consider the side effects of Claimant's medication.

Claimant argues that the ALJ's RFC finding does not take into account any of the side effects of her medications. The RFC assessment must be based on several factors, including the side effects of medications, and failure to incorporate these constitutes legal error. SSR

96-8p. Here, Claimant testified that her medications caused her to feel very tired and she had to lay down after taking her medication. R. 596-97. She further testified the medication caused her to become spacey and sometimes caused headaches or blurry vision. R. 633, 637-38. Dr. Tao stated that Claimant suffered dizziness, lethargy, and a lack of alertness as a result of her seizure medication. R. 547. Yet the ALJ failed to incorporate any of these effects into his RFC assessment or explain why he disregarded this evidence. R. 21. Because he failed to consider the uncontradicted side effects of Claimant's medications, his RFC assessment did not consider all of Claimant's limitations, and was therefore incomplete.

### 3. The ALJ's decision did not articulate substantial evidence to support the ALJ's RFC assessment of Claimant's physical abilities.

Claimant argues the ALJ's RFC does not correspond to Claimant's physical abilities. The ALJ determined that Claimant "can stand and walk about six hours during an eight hour-day," because he relied on the State Agency's RFC assessment R. 21, 284. Claimant testified that she could only stand about thirty to forty minutes and she could not walk more than one block due to her asthma. R. 602-03. The ALJ did not reconcile the differences between the State Agency RFC and Claimant's testimony about her abilities. R. 284. The State Agency's RFC was based only on Claimant's hyperthyroidism and post-total thyroidectomy, and it did not consider her other impairments. R. 283-90.

An ALJ needs to recontact medical sources when the evidence received is inadequate to determine if the claimant is disabled. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Dr. Jain assessed Claimant with an impaired ability to stand and walk due to the effects of her medication, but the ALJ rejected that assessment as "too vague to be useful."

R. 537, 20. The ALJ did not recontact Dr. Jain to clarify the physical limitations, but instead continued to rely on the State Agency's assessment, even though that assessment was not current. R. 20, 283. Because Dr. Jain's assessment was too vague and thus inadequate to determine Claimant's abilities, the ALJ should have contacted Dr. Jain to clarify Claimant's current physical abilities.

### 4. The ALJ's RFC assessment fails to consider all of the effects of Claimant's seizure disorder.

Claimant asserts the ALJ did not consider all of her limitations due to her seizure disorder. An RFC assessment also must be based on the effects of symptoms of an impairment. SSR 96-8p. The ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but instead must make a connection between all the evidence and his conclusion. *Herron*, 19 F.3d at 333; *Zurawski*, 245 F.3d at 887.

In this case, the effects at issue stem from seizures, and because of Claimant's seizure disorder, the ALJ determined that Claimant could not work near heights or moving machinery, and must be confined to low stress activity. R. 21. The ALJ based this assessment on reports from Dr. Tao, but he failed to explain why he rejected other limitations noted by Dr. Tao. R. 21. Dr. Tao reported that after a seizure, Claimant would likely experience confusion, exhaustion, muscle strain, and irritability, and because of her seizures she was likely to require more supervision at work, likely to disrupt co-workers, and likely to miss three days of work each month. R. 530-31, 546-47. The ALJ did not consider these effects of the seizures when making his assessment.

An ALJ "has a duty to solicit additional information to flush out an opinion for which

the medical support is not readily discernable." *Barnett*, 381 F.3d at 669. Therefore, the ALJ

should have sought to obtain more evidence regarding post-seizure manifestations from Dr.

Tao. *Barnett*, 381 F.3d at 669.

**B.    THE ALJ'S STEP FIVE CONCLUSION IS ERRONEOUS BECAUSE IT RELIES ON INCOMPLETE HYPOTHETICAL QUESTIONS AND DOES NOT CONSIDER ALL OF CLAIMANT'S LIMITATIONS.**

Finally, Claimant asserts that the ALJ's determination of her transferable skills and ability to find work is erroneous because the ALJ failed to incorporate all of Claimant's limitations in his RFC assessment, and thus posed incomplete hypotheticals to the VE. Claimant's is also concerned that the ALJ did not define what Dr. Tao meant by "low stress" in his assessment and so the VE was not aware of Claimants actual limitations.  R. 648-49.

Hypothetical questions posed to a VE must include all of a claimant's limitations that are supported by medical evidence.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The VE "must understand the full extent of [a claimant's] disability so that the expert does not declare the [claimant] capable of undertaking work in the national or local economy that [claimant] cannot perform."  *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004).  Here, the VE testified that he considered a low stress job according to the DOT to be a job where one can work at one's own pace.  R. 649.  However there was no indication that the VE's definition corresponded with Dr. Tao's definition of "low stress."  *Id.*

The ALJ's finding that there were jobs in the economy that Claimant could perform is predicated on the assumption that the ALJ incorporated all of Claimant's limitations into the RFC assessment.  Yet, since the ALJ did not incorporate the side effects of Claimant's medications, the effects of Claimant's seizures on her abilities, or the limitations of Claimant's physical abilities, the ALJ's hypothetical questions were incomplete and cannot be used as substantial evidence supporting the ALJ's step five findings.

## IV.  CONCLUSION

The ALJ erred when he mislabeled Claimant's asthma as "mild" instead of "moderate," failed to recontact doctors to clarify the effects of Claimant's impairments, and failed to question Claimant about her non-compliance with her seizure medication before he made his conclusions.  He further erred when he did not incorporate all of Claimant's limitations into his RFC assessment, and therefore his step five determination is erroneous. **For the reasons set forth in this opinion, Plaintiff's motion for summary judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and the matter is remanded to the Commissioner for further proceedings.**

**SO ORDERED THIS 26TH DAY OF JULY, 2006.**


**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**


**Copies mailed to:**

Frederick J. Daley, Jr.
Barbara H. Borowski
DALEY, DEBOFSKY & BRYANT
One N. LaSalle Street, Suite 3800
Chicago, IL 60602

Counsel for Plaintiff

James B. Geren
Assistant Regional Counsel
Social Security Administration
200 West Adams Street, 30th Floor
Chicago, IL 60606

Samuel S. Miller
Assistant United States Attorney
219 South Dearborn
Chicago, IL 60604

Counsel for Defendant